WILLARD F. KEENEY, ADMINISTRATOR, ETC., ET AL. V.
JAMES W. CONVERSE ET AL.

*Corporations—Fraudulent conduct of director—Laches—Account-
ing.*

1. A delay by stockholders for 10 years after an alleged fraud-
ulent purchase of a portion of the unissued stock of the cor-
poration by one of its directors from a stranger, to whom all
of said stock had been sold by the board of directors, is fatal
to the maintenance of a bill to compel the director to pay
over to the corporation the moneys obtained by him by means
of his alleged fraudulent purchase.

2. The alleged fraudulent character of the provisions of a mort-
gage given to a director of a corporation by order of its board
of directors cuts little figure in a suit by stockholders against
the director, in which he is charged with wrecking the cor-
poration by the improper use of the mortgage, unless it
appears that the mortgage has been used to the injury of the
complaining stockholders.

3. There is no necessity for an accounting by the director if it
appears that he has no property that ever belonged to the
corporation.

Appeal from Kent. (Adsit, J.) Argued January 18,
1894. Decided March 20, 1894.

Bill for an accounting. Defendants Converse and Stev-
ens appeal from an order overruling demurrer. Reversed,
and bill dismissed. The facts are stated in the opinion.

*W. D. Fuller*, for complainants.

*Fletcher & Wanty*, for appellants.

HOOKER, J. The complainants file a bill in which they
.are alleged to be stockholders in the Grand Rapids Man-
ufacturing Company. James W. Converse and Wilder D.
Stevens, who were directors in said company, and David

P. Clay, a stockholder, were made parties defendant, as was also the company itself. Relief is prayed against Converse only, viz., that he be required—

1. To pay over to the company certain moneys obtained by him by means of a fraudulent purchase of stock.

2. To account with the complainants relative to the value of the capital stock of the company at the time of an alleged seizure of its property by him.    •

The defendants Converse and Stevens demurred to the bill.

The basis for the first prayer is as follows: The company was organized as a corporation under the laws of the State in January, 1878. Its property was sold under a decree of foreclosure in March, 1890. Its capital stock was fixed at $30,000. Of this, about $11,000 only had been paid in, leaving $19,100 in the hands of the treasurer for sale. In October, 1881, the company was indebted to a considerable amount, and it was proposed to increase the capital stock. Clay, who was not a member of the concern, was consulted, and advised the sale of the stock, which it was finally determined should be made. An offer of $15,000 for the $19,100 of stock, made by Clay, was refused. Converse then told Clay that, if he would let him have $7,000 of the stock at the proposed price, he (Converse) would get the resolution passed by the board, authorizing the sale to him, to which Clay replied: "I will buy it, and you may have the whole of it. I do not care for it, as I have all the business on my hands that I can care for." This arrangement was carried out, Converse taking $7,000 of the stock. It is now claimed that this stock was worth a premium of 10 cents, and was sold at a discount of about 20 cents, and that Converse made $2,170 by the deal. The bill states that Converse "procured this resolution to be passed by deceitful and fraudulent misrepresentation and influence."

It is noticeable that there was a necessity for money; that the company sought and acted upon Clay's advice; that he apparently had no desire to purchase, though for some reason was willing to; that complainant Noyes F. Avery was one of the directors at the time; and that, for aught that appears, all joined in the action of the board. There is nothing to indicate that the arrangement was a secret one on the part of Converse and Clay, and no specific deceit or fraud is set up; complainants contenting themselves with charging it in the most general language, and upon information and belief. Again, 10 years elapsed from the time of that transaction before the complainants commenced their proceedings. If the facts charged were otherwise sufficient, we think that complainants' laches are fatal to their claim.

The other claim depends upon later transactions. It appears that on August 30, 1886, the company had become largely indebted to various persons; that, of this, all, or nearly all, was represented by notes made by the company, payable to Clay or order, and by him indorsed and placed upon the market. "Of this indebtedness upon Clay's paper, which amounted to $73,542.98, the amount of $39,500 had come into the hands of Converse, and had been indorsed by him, and put in circulation and sold." It is difficult to say what is meant by this unless it means that Converse had loaned the concern $39,500 upon its paper indorsed by Clay, which he had been able to borrow for it by adding his own indorsement. This being the situation on August 30, 1886, the bill says that Converse offered a resolution, which was immediately ·passed, he, Clay, and Stevens being a majority of the board of directors, and constituting a quorum thereof, considering the said indebtedness of the company, and the demand of Clay for security for his indorsement. This mortgage was made and delivered, but Converse, being dissatisfied with

the arrangement, demanded security for the notes indorsed by him, though secured by Clay's mortgage. Stevens thereupon offered a resolution to that effect. The two resolutions are as follows:

"*Whereas*, David P. Clay has become indorser and surety for this company upon his notes, commercial paper, and other obligations to the amount of $73,542.98, and has agreed to become indorser and surety on other and future obligations of this company up to the amount of $75,000 for two years from date.

"*And whereas*, the said Clay demands security upon all the property of this company against his liability as such indorser and surety, and refuses to continue such indorsements and suretyships without such security:

"*Therefore, resolved*, that this company execute and deliver to said Clay a mortgage upon all its property to secure him as aforesaid, conditioned, substantially, to pay at maturity the obligations of this company upon which he is indorser or surety, and to save him harmless from all actions, costs, expenses, and demands whatsoever by reason of his being, or hereafter becoming, liable as such indorser or surety, and that the president or vice-president and secretary of this company be authorized and directed to execute and deliver such mortgage."

"*Whereas*, this company is indebted to James W. Converse in the sum of $39,500 on promissory notes for money loaned by said Converse to this company.

"*And whereas*, said Converse has discounted one of said notes for five thousand dollars ($5,000), which is now outstanding and not yet matured, and upon which he is liable as indorser, and which said Converse has agreed to pay and take up at maturity:

"*And whereas*, said Converse demands security for the payment of said indebtedness, and has agreed to extend the time of payment five years from the date hereof if such security be given:

"*Therefore, resolved*, that this company execute and deliver to said Converse a bond and mortgage upon all the property of this company to secure the payment of said indebtedness, and that the president or vice-president and secretary be authorized and directed to execute and deliver such bond and mortgage."

The bill does not say that the meetings at which these

resolutions were adopted were not attended by all of the directors, unless it is to be inferred from the statement that Converse, Clay, and Stevens formed a quorum. That others were present seems to be implied by the statement that the second mortgage was given for the purpose of inducing Converse to carry the debt for five years, and that it would not have been made except for his agreement to do so,—which may have been intended as an allegation that he did so agree,—and the further statement that, after the board adjourned, he fraudulently and deceitfully procured his mortgage to be so drawn as to make interest payable semi-annually, and incorporated, contrary to the provision of the resolution, an authority to declare the whole amount of principal to be due and payable if the accrued interest should be due and unpaid for 30 days. There is nothing to show when this came to the knowledge of the directors or complainants; but in April, 1887, defendant Converse declared his debt due, took possession of the property under his mortgage, and shut up its factory, stopped all business, and wrecked and destroyed the same. While the bill states that this was done without any legal proceedings, it does not assert that it was illegally or wrongfully done. The bill then states that one Harry Brown, a holder of some of the Clay paper, commenced foreclosure proceedings against the company. The bill does not state when this was done, but it does say that the court appointed a receiver, under whose management the sum of $10,000 was made during the next two years, and, as the matter was closed up in March, 1890, the foreclosure proceedings must have been commenced as early as March, 1888. Under these foreclosure proceedings, Converse abandoned his mortgage, and came in and proved his claims, and subsequently purchased claims of other creditors at large discounts. A decree was obtained, under which the property of the company was

sold for the amount of the claims proved, and subsequently another company was formed, and is successfully carrying on the business. Complainants appear to base their claim to a reckoning upon this branch of the case on the alleged wrecking of the company by reason of Converse's taking possession and closing the property. They ask that he shall account to them for the value of the capital stock at that time, which they allege to have been worth a premium of 50 or 75 per cent.

It does not appear that Converse has received any of the property of the concern. It was all sold under a decree of court, and bid in by some one not named; and, while the bill does not say that he received anything, we may, perhaps, infer that he received, upon distribution of the sum realized, the amount of the claim owned by him. Nothing is shown indicating that his taking possession and closing the factory hastened Brown's foreclosure, and that it was not wrecked by such closing is indicated by the successful management of the business by the receiver. The alleged fraudulent character of the provisions of the Converse mortgage cut little figure, unless we can see that such mortgage has been used to the injury of the complainants. The position of complainants seems to be—

1. That the defendant Converse fraudulently caused his mortgage to provide for semi-annual interest.

2. That he fraudulently inserted a provision that non-payment of interest for 30 days should permit him to declare the principal due.

3. That he took possession and closed the factory under the mortgage, thereby wrecking the business, though it went into the hands of a receiver, who made large profits for the company, upon the foreclosure of an earlier mortgage, the Converse mortgage being thereupon abandoned.

We think this does not show a case which should give complainants the right to recover from the defendant

Converse a sum equal to the value of the capital stock at the time of the closing of the factory, or any other sum, in this proceeding. Defendant Converse has no property that ever belonged to the company, so far as this bill shows. There is, therefore, no occasion for an accounting.

The decree of the circuit court in chancery should be reversed, and the bill dismissed, with costs of both courts.

The other Justices concurred.